# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **JENNIFER GLASS, et al.,** | **CASE NO. 5:19-CV-01331** |
| **Plaintiffs,** | |
| -vs- | **JUDGE PAMELA A. BARKER** |
| **TRADESMEN INTERNATIONAL, LLC, et al.,** | **MEMORANDUM OF OPINION AND ORDER** |
| **Defendants.** | |

This matter comes before the Court upon several motions of the parties. On June 17, 2019, Defendant Tradesmen International, LLC ("Tradesmen") filed a Motion to Dismiss or Strike Plaintiffs' Class Claims ("Motion to Strike Class Claims"). (Doc. No. 8.) Plaintiffs Jennifer Glass ("Glass"), Kristie Masiella ("Masiella"), and Tracy Reese ("Reese") (collectively, "Plaintiffs") filed a brief in opposition to Tradesmen's Motion to Strike Class Claims on July 1, 2019, to which Tradesmen responded on July 15, 2019. (Doc. Nos. 14, 16.) Also, on June 17, 2019, Tradesmen filed a Motion to Compel Individual Arbitration and to Dismiss the Claims of Plaintiffs Masiella and Glass ("Motion to Compel Arbitration"). (Doc. No. 9.) Plaintiffs filed a brief in opposition to Tradesmen's Motion to Compel Arbitration on July 1, 2019, to which Tradesmen responded on July 15, 2019. (Doc. Nos. 15, 18.)

On June 19, 2019, Defendant Matthew McClone ("McClone") filed a Motion to Join Pending Dispositive Motions ("Motion to Join"), seeking to join as a moving party with respect to both of Tradesmen's Motions. (Doc. No. 12.) Plaintiffs have not opposed McClone's request.

Finally, on July 1, 2019, Plaintiffs filed a Motion to Remand, or, in the Alternative for Expedited Discovery Regarding Prospective Class ("Motion to Remand"). (Doc. No. 13.) Tradesmen filed a brief in opposition to Plaintiffs' Motion to Remand on July 15, 2019, to which Plaintiffs responded on July 22, 2019. (Doc. Nos. 17, 19.) After the Court permitted Plaintiffs to conduct limited discovery regarding the prospective class, Plaintiffs and Tradesmen filed supplemental briefs on October 3, 2019 and October 17, 2019, respectively. (Doc. Nos. 23, 24.)

For the following reasons, McClone's Motion to Join (Doc. No. 12) is GRANTED, Plaintiffs' Motion to Remand (Doc. No. 13) is DENIED, Tradesmen's Motion to Strike Class Claims (Doc. No. 8) is GRANTED, and Tradesmen's Motion to Compel Arbitration (Doc. No. 9) is GRANTED IN PART.

## I. Background

### a. Factual Background

#### i. Plaintiffs' Employment at Tradesmen

Tradesmen describes itself as a staffing company that specializes in providing skilled and experienced craft professionals to employers throughout the United States and Canada. (Doc. No. 8-1 at 2.) It is a Delaware limited liability company, but maintains its corporate headquarters in Macedonia, Ohio. (Doc. No. 1-3 at ¶¶ 4-5.)

Plaintiffs are all former Tradesmen employees that worked in various positions in the company between 2004 and 2017. (Doc. No. 1-2 at ¶¶ 52, 67-68, 81.) Plaintiffs each claim that they were subjected to severe discrimination and sexual harassment while they were employed by Tradesmen. (*See id.* at ¶¶ 52-91.)

In particular, Masiella and Reese allege that their supervisor, McClone, harassed and unfairly targeted them for negative treatment after they rebuffed his sexual advances and that Tradesmen took no action against him despite their complaints to Tradesmen's Human Resources and other upper-level executives. (*Id.* at ¶¶ 52-80.) Masiella claims that she was forced to take another position for less pay at Tradesmen in order to get away from McClone, but the new position was not sustainable, and she ended up leaving Tradesmen. (*Id.* at ¶ 66.) Reese claims McClone eventually fired her for not having sex with him and for complaining to Human Resources about his behavior. (*Id.* at ¶ 80.)

Glass does not make any specific allegations against McClone, but asserts that her male colleagues, managers, and even senior executives would frequently remark on her dress, her breasts, and other parts of her body, tell obscene and sexually-charged jokes, and engage in sexual innuendo that had the effect of objectifying women. (*Id.* at ¶¶ 84-85.) Glass also claims that she was groped by her superiors and denied promotions because she was a woman. (*Id.* at ¶¶ 87-89.) According to Glass, she left Tradesmen after learning that Tradesmen had begun to search for someone to replace her and that she was going to lose her job. (*Id.* at ¶¶ 90-91.)

Plaintiffs assert that similar unlawful conduct and differential treatment between male and female employees occurs as a pattern and practice throughout all of Tradesmen's offices. (*See id.* at ¶¶ 30-38.)

### ii. Tradesmen's Employment Arbitration Agreement

On October 7, 2016, while Masiella and Glass were still employed at Tradesmen, Tradesmen emailed an Employment Arbitration Agreement (the "Arbitration Agreement") to all employees with active Tradesmen email addresses, including Masiella and Glass. (Doc. No. 10 at ¶¶ 5, 10-11.) On October 11, 2016, Tradesmen sent a follow-up email containing the Arbitration Agreement to all

Tradesmen employees with active email addresses who did not open the earlier email sent on October 7, 2016, including Masiella. (*Id.* at ¶¶ 6, 12.)

Tradesmen's records show that both Masiella and Glass received and opened an email containing the Arbitration Agreement. (*Id.* at ¶¶ 16-23.) Tradesmen utilizes software that, among other things, allows it to track activity associated with sent emails and to generate reports reflecting that activity. (*Id.* at ¶¶ 13-17.) Tradesmen utilized this software on October 7, 2016, when it sent the Arbitration Agreement to Glass, and it utilized this software on October 11, 2016, when it sent the Arbitration Agreement to Masiella. (*Id.* at ¶ 16.) According to Tradesmen's records, Glass opened the October 7, 2016 email containing the Arbitration Agreement fifteen times—nine times on October 7, 2016, five times on October 9, 2016, and one time on October 10, 2016. (*Id.* at ¶ 20.) In addition, Masiella opened the October 11, 2016 email containing the Arbitration Agreement twenty-three times—twenty-one times on October 12, 2016, one time on October 13, 2016, and one time on November 14, 2016. (*Id.* at ¶ 23.)

The first paragraph of the Arbitration Agreement provides in bold: "**You consent to this Agreement by continuing or accepting employment with Tradesmen International, LLC, unless you take the steps to opt out of this Agreement as described below.**" (Doc. No. 10-1 at 2.) In Paragraph C.2, the Arbitration Agreement further explains:

> If you are <u>actively employed</u> with Tradesmen, as defined above, your consent to this Agreement will be expressed by: (a) continuing employment with Tradesmen on and after October 21, 2016; or (b) your acceptance of any assignment, wages, salary, promotion, increase, transfer, bonus or other benefit of employment after on or [sic] October 21 , 2016, provided that you have not previously opted out of this Agreement. <u>If you do not agree to the terms of this Agreement</u>, you must notify Tradesmen that you are opting out of this Agreement by no later than October 21, 2016 by sending a completed copy of the attached Opt Out Form by certified mail or overnight delivery to Tradesmen International, LLC, Human Resources Department ("<u>Tradesmen HR</u>"): Attention Arbitration, 9760 Shepard Road, Macedonia, Ohio 44056.

(*Id.* at 5.)  With respect to the opt-out procedure, the Opt-Out Form similarly provided: "I understand that I am responsible for sending this opt out form to Tradesmen International, LLC, Human Resources Department: Attention Arbitration, 9760 Shepard Road, Macedonia, OH 44056, by certified mail or overnight delivery, and that I should retain proof that I have sent this form to the above address by either certified mail or overnight delivery."  (Doc. No. 18-1 at Ex. 7.)

In Paragraph A.2, the Arbitration Agreement also expressly recites several purported forms of consideration for the mutual agreements contained in the Arbitration Agreement, including, among other things, "your continued employment with Tradesmen," "your acceptance of any assignment, wages, salary, promotion, increase, transfer, bonus, or other benefit of employment," and "our mutual promise to follow this Agreement's provisions, including those governing mandatory, binding arbitration."  (Doc. No. 10-1 at 3.)  Paragraph A.2. further provides:

> [Y]ou and Tradesmen agree that if we are not able to first resolve "Covered Claims" (as defined below), we agree to binding arbitration as the exclusive means to resolve the disputes that may arise out of the Covered Claim.  In this regard, you and Tradesmen thus agree that as otherwise provided in this Agreement, neither of us may initiate or prosecute any lawsuit or administrative action in any way related to a Covered Claim.  **Thus, we understand and agree that arbitration is the only litigation forum for resolving Covered Claims, and that both of us are waiving the right to a trial before a judge or jury in federal or state court in favor of arbitration.**

(*Id.*)  The Arbitration Agreement defines Covered Claims as including "all claims or controversies, past, present or future" arising from "employment or termination of employment," including claims for "discrimination and/or harassment."  (*Id.*)

Finally, with respect to class litigation, the Arbitration Agreement provides:

> You and Tradesmen agree that each of us will bring any dispute only in an individual capacity, not as a plaintiff or class member in any purported class, collective, or representative proceeding.  We also agree that the Arbitrator in any dispute between

> us may not consolidate more than one person's claims, and may not otherwise preside
> over any form of a representative, collective, or class proceeding.

(*Id.* at 4.)

Neither Masiella nor Glass dispute that they received the Arbitration Agreement in October 2016. Subsequently, Glass did not submit an Opt-Out Form and continued her employment with Tradesmen through the first week of November 2016. (Doc. No. 11 at ¶¶ 12, 14; Doc. No. 15-1 at ¶ 7.) However, Glass contends that although she continued to work for Tradesmen through the first week of November 2016, she had already accepted a job from a new employer prior to the October 21, 2016 deadline for opting out of the Arbitration Agreement. (Doc. No. 15-1 at ¶¶ 6-7.)

Masiella continued her employment with Tradesmen through approximately January 27, 2017. (Doc. No. 11 at ¶ 15.) According to Tradesmen's former Director of Human Resources, Jeannie Woodall ("Woodall")—who was responsible for overseeing the logging and maintaining of copies of any Opt-Out Forms submitted to Tradesmen—Masiella did not return an Opt-Out Form and does not appear on a spreadsheet that tracked which employees had submitted an Opt-Out Form. (*Id.* at ¶¶ 2, 9-13.) In contrast, Masiella contends that, before October 21, 2016, she executed an Opt-Out Form, brought it into Tradesmen, and hand-delivered it to Woodall. (Doc. No. 15-2 at ¶ 5.) Masiella claims that Woodall accepted the Opt-Out Form from her and at no time stated that Masiella needed to mail the form to her. (*Id.*) Masiella asserts that she chose to opt out of the Arbitration Agreement after consulting her husband, who told her to sign the Opt-Out Form and that he had faced a similar situation at a previous employer. (*Id.* at ¶ 2.)

### b. Procedural History

On May 10, 2019, Plaintiffs filed a Class Action Complaint ("Complaint") against Tradesmen and McClone (collectively, "Defendants") in the Court of Common Pleas of Summit County, Ohio.

(Doc. No. 1-2.)  In the Complaint, Plaintiffs assert claims on behalf of themselves and a putative class of female employees against Defendants for gender discrimination, sexual harassment/hostile work environment, retaliation, and aiding and abetting discrimination in violation of the Ohio Civil Rights Act, Ohio Rev. Code § 4112.  (*Id.*)  Plaintiffs define the proposed class as "all females who are, have been, or will be employed by Tradesmen during the applicable liability period until the date of judgment."  (*Id.* at ¶ 19.)

On June 10, 2019, Tradesmen removed the suit to this Court, asserting that federal jurisdiction exists pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA").  (Doc. No. 1.)  Shortly thereafter, on June 17, 2019, Tradesmen filed its Motion to Strike Class Claims, seeking to dismiss or strike Plaintiffs' class claims for a variety of reasons.  (Doc. No. 8.)  On the same day, Tradesmen also filed its Motion to Compel Arbitration, requesting an order compelling individual arbitration and dismissing the claims of Glass and Masiella.  (Doc. No. 9.)[1]

On July 1, 2019, Plaintiffs filed their Motion to Remand.  (Doc. No. 13.)  Based on certain exceptions to CAFA jurisdiction, Plaintiffs claim that this Court either lacks subject matter jurisdiction entirely or should decline to accept such jurisdiction.  (*Id.*)  Plaintiffs also sought limited discovery regarding prospective class members in support of their position that an exception to CAFA jurisdiction applies in this case.  (*Id.*)  On August 19, 2019, the Court granted Plaintiffs' request for expedited discovery regarding prospective class members and permitted both parties to submit supplemental briefs once discovery was completed, which Plaintiffs and Tradesmen did on October 3, 2019 and October 17, 2019, respectively.  (Doc. Nos. 22-24.)

---

[1] On June 19, 2019, McClone moved to join as a moving party in both Tradesmen's Motion to Strike Class Claims and its Motion to Compel Arbitration.  (Doc. No. 12.)  Plaintiffs have not opposed that request. The Court finds McClone's unopposed Motion to Join well-taken, and it is thus granted.

## II.  Plaintiffs' Motion to Remand

### a.  Legal Standard

The Court will consider Plaintiffs' Motion to Remand first, as jurisdiction is a threshold matter that must be decided before the Court may rule on other issues.  *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999) ("The requirement that jurisdiction be established as a threshold matter . . . is inflexible and without exception . . . for [j]urisdiction is power to declare the law, and [w]ithout jurisdiction the court cannot proceed at all in any cause.") (internal quotations and citations omitted).

Pursuant to 28 U.S.C. § 1447(c), "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."  Ordinarily, "[a]ll doubts as to the propriety of removal are resolved in favor of remand."  *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 493 (6th Cir. 1999).  However, "no antiremoval presumption attends cases invoking CAFA, which Congress enacted to facilitate adjudication of certain class actions in federal court."  *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014).  Indeed, CAFA is "not to be read narrowly, but as a broad grant of jurisdiction in interstate class actions."  *Davenport v. Lockwood, Andrews & Newnam, Inc.*, 854 F.3d 905, 910 (6th Cir. 2017).

However, "nothing in CAFA alters the traditional rule that the removing party bears the burden of establishing the jurisdictional elements."  *Mason v. Lockwood, Andrews & Newnam, P.C.*, 842 F.3d 383, 389 (6th Cir. 2016).  CAFA vests district courts with original jurisdiction over class actions in which any member of the plaintiff class is a citizen of a state different from any defendant, the aggregate number of proposed plaintiffs is 100 or greater, and the amount in controversy exceeds $5 million.  *See* 28 U.S.C. § 1332(d)(2).  Once these jurisdictional requirements of CAFA have been

established, "the party seeking to remand bears the burden of establishing an exception to CAFA jurisdiction by a preponderance of the evidence." *Mason*, 842 F.3d at 389.

### b. Analysis

Plaintiffs do not challenge the fact that Tradesmen has established the jurisdictional requirements under CAFA. There is no dispute that minimal diversity of citizenship exists, that the proposed class includes at least 100 members, and that the aggregate amount in controversy exceeds $5 million. (*See* Doc. No. 1 at ¶¶ 4-13.) Instead, Plaintiffs contend that two exceptions under CAFA—the "local controversy" exception and the "interests of justice" exception—warrant remand. (Doc. No. 13-1 at 4-10.)

#### i. Local Controversy Exception

Tradesmen claims that the local controversy exception is inapplicable because Plaintiffs cannot satisfy their burden to prove that more than two-thirds of the members of Plaintiffs' proposed class are citizens of Ohio. (Doc. No. 17 at 6-12.) While Plaintiffs originally moved to remand the case based on the local controversy exception, they appear to concede in their supplemental brief— filed after conducting discovery—that they cannot satisfy the exception's requirements. (*See* Doc. No. 13-1 at 4-8; Doc. No. 23.) Nonetheless, the Court will address the issue and concludes that the local controversy exception does not require the Court to remand the case to state court.

Under the "local controversy" exception to CAFA jurisdiction, "a district court must decline to exercise CAFA jurisdiction over any class action in which (1) more than two-thirds of the members of all proposed plaintiff classes (in the aggregate) are citizens of the state in which the class action was originally filed; (2) at least one defendant from whom significant relief is sought, and whose alleged conduct forms a significant basis for the plaintiffs' claims, is a citizen of the state in which

the class action was originally filed; (3) the principal injuries resulting from the alleged conduct of each defendant were incurred in the state in which the class action was originally filed; and (4) during the three-year period preceding the filing of the class action, no other class action has been filed." *Evans v. AMISUB (SFH), Inc.*, No. 17-cv-2528-JPM-tmp, 2017 WL 9807437, at *1 (W.D. Tenn. Dec. 8, 2017) (citing 28 U.S.C. § 1332(d)(4)(A)).[2]

Generally, courts assess the citizenship of prospective class members based on the definition of the proposed class enumerated in the complaint. Courts have recognized that "[t]he proposed class definition is crucial to the citizenship analysis, and a plaintiff who defines a class narrowly is much more likely to achieve remand." *Id.* at *2. Indeed, plaintiffs can specifically limit the citizenship of the proposed class in their complaint to avoid federal jurisdiction under CAFA. *See In re Sprint Nextel Corp.*, 593 F.3d 669, 676 (7th Cir. 2010) ("Alternatively, the plaintiffs might have defined their class as all Kansas citizens who purchased text messaging from Sprint Nextel or an alleged coconspirator. By using that definition, the plaintiffs could have guaranteed that the suit would remain in state court."); *Johnson v. Advance Am.*, 549 F.3d 932, 937 (4th Cir. 2008) ("In this case, the plaintiffs, as masters of their complaint, limited the class to citizens of South Carolina.").

On the other hand, when a complaint includes a broad class definition, it is more difficult to show that remand is appropriate. For example, in *Evans*, the court noted that "[o]n its face, th[e] class definition appears to include (1) individuals against whom Tennessee hospital liens were wrongly filed prior to 2015 or since 2016, (2) individuals against whom *non-Tennessee* hospital liens were

---

[2] "Similarly, under the 'home state controversy' exception to CAFA jurisdiction, a district court must decline to exercise CAFA jurisdiction if (1) at least two-thirds of the members of all proposed plaintiff classes (in the aggregate) are citizens of the state in which the class action was originally filed, and (2) all of the primary defendants are citizens of the state in which the class action was originally filed." *Evans*, 2017 WL 9807437, at *1 (citing 28 U.S.C. § 1332(d)(4)(B)).

wrongly filed at any time, and (3) individuals who were overcharged for medical services but against whom no hospital liens were filed." 2017 WL 9807437, at *3. Yet, the plaintiffs failed to present any evidence with respect to the citizenship of the individuals in these three groups. *Id.* Accordingly, the court found that plaintiffs had failed to meet their burden of demonstrating that their suit fell within the local controversy exception to CAFA jurisdiction. *Id.* at *4.

Here, Plaintiffs have failed to establish that two-thirds of the members of their proposed class are citizens of Ohio, the state in which this action was originally filed. In their Complaint, Plaintiffs define their proposed class as follows:

> The Proposed Rule 23 Class consists of all females who are, have been, or will be employed by Tradesmen during the applicable liability period until the date of judgment.

(Doc. No. 1-2 at ¶ 19.) This definition unambiguously proposes a nationwide class of all of Tradesmen's female employees. Plaintiffs provide no evidence that demonstrates that two-thirds of such individuals are citizens of Ohio, while Tradesmen has submitted evidence indicating that more than two-thirds of the putative class members are citizens of states *other than Ohio*. (*See* Doc. No. 1-3 at ¶¶ 8-15.) As such, Plaintiffs have failed to meet their burden to show that the local controversy exception applies.

To avoid this conclusion, Plaintiffs contend that despite the class definition in their Complaint, their proposed class does not encompass all Tradesmen employees nationwide, but is limited to those employees who could bring claims under the Ohio Civil Rights Act. (Doc. No. 13-1 at 7.) Plaintiffs assert "it was never the intent of Plaintiffs to move for class certification for any individuals who could not bring a claim under Ohio law." (*Id.*) Plaintiffs argue this intent is demonstrated by the fact that their Complaint only sets forth claims under Ohio law and refers to members of the putative class

as "members of the R.C. §4112.99 Class." (Doc. No. 1-2 at ¶ 20.) They also argue that Tradesmen's interpretation is overly formalistic and that courts often permit ongoing revisions to class definitions. (Doc. No. 19 at 2-3.)

The Court finds Plaintiffs' arguments unpersuasive. Plaintiffs' class definition is unambiguous. It contains no limitations as to the citizenship of the class members and proposes a class consisting of all of Tradesmen's female employees, regardless of where they live or their connections to Ohio. Moreover, the allegations in Plaintiffs' Complaint indicate an intention not to limit the class to those employees who were harmed in Ohio, as Plaintiffs allege the following: "Tradesmen's employment policies, practices, and procedures are not unique or limited to any office; rather, they apply uniformly and systematically to employees throughout the company, occurring as a pattern and practice throughout all office locations. They thus affect the Class Representatives and Class members in the same ways regardless of the office location in which they work." (Doc. No. 1-2 at ¶ 33.) A single reference in the Complaint to the class as the "R.C. §4112.99 Class" does not alter the scope of the class definition spelled out in the Complaint.

Nor may Plaintiffs amend their class definition through their motion papers. *See Brown v. Whirlpool Corp.*, 996 F. Supp. 2d 623, 645 (N.D. Ohio 2014) ("[I]t is hornbook law that 'a complaint cannot be amended by briefs in opposition to a motion to dismiss.'") (quoting *Dana Ltd. v. Aon Consulting, Inc.*, 984 F. Supp. 2d 755, 767 n. 2 (N.D. Ohio 2013)). The cases cited by Plaintiffs in support of their contention that courts may accept revisions to clarify a class definition are each in the context of motions for class certification—not the determination of whether a CAFA exception applies, which is ordinarily based on the face of the complaint. *See Powers v. Hamilton Cty. Public Def. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007) ("As demonstrated by our own clarifying revision

to the class definition, courts must be vigilant to ensure that a certified class is properly constituted."); *In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir. 2004) ("If the class is certified on remand, we trust that the plaintiffs or district court will amend the definition accordingly.").

Additionally, even if the Court could consider an amended definition, Plaintiffs themselves have proposed an unworkable number of inconsistent class definitions in an attempt to limit the class to employees with claims under Ohio law. (*Compare* Doc. No. 13-1 at 7 ("[T]he putative class of women nationwide *would only include* those women employees at Tradesmen who are either residents of Ohio or who worked in Ohio during the relevant period."), *with* Doc. No. 14 at 6 ("[T]here are some potential class members that travelled into the State of Ohio or otherwise experienced sexual harassment or discrimination that is directly tied to conduct that occurred in the State of Ohio.").)

Accordingly, as set forth above, the Court must look to the class definition pled in Plaintiffs' Complaint, which unambiguously consists of all female Tradesmen employees. Plaintiffs have failed to establish that two-thirds of the members of this class are citizens of Ohio, and thus have failed to meet their burden to show that the local controversy exception applies.[3]

## ii. Interests of Justice Exception

Tradesmen argues that Plaintiffs cannot show that even one-third of the members of the proposed class are citizens of Ohio, and that the interests of justice exception is therefore also inapplicable. (Doc. No. 24 at 9.) Alternatively, Tradesmen asserts that even if the Court finds that the one-third threshold has been met, a balancing of the relevant factors does not support remand.

---

[3] Even if this Court were to entertain some version of Plaintiffs' revised class definition—which, in Plaintiffs supplemental brief, appears to include all female Tradesmen employees who lived in Ohio or traveled to Ohio in connection with their employment during the relevant time frame—the evidence shows that Plaintiffs have still not met their burden. Plaintiffs concede that, even under their revised class definition, discovery shows that only 57.8 percent of the putative class members are residents of Ohio. (Doc. No. 23 at 9.)

(*Id.* at 10-18.)  Plaintiffs once again argue that Tradesmen misconstrues the scope of their proposed class and that the factors indicate the Court should decline jurisdiction.  (Doc. No. 23 at 7-10.)

Under CAFA, courts may exercise their discretion to decline jurisdiction under the interests of justice exception based on the consideration of several factors.  This exception provides:

> (3) A district court may, in the interests of justice and looking at the totality of the circumstances, decline to exercise jurisdiction under paragraph (2) over a class action in which greater than one-third but less than two-thirds of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the State in which the action was originally filed based on consideration of--
>
>> (A) whether the claims asserted involve matters of national or interstate interest;
>>
>> (B) whether the claims asserted will be governed by laws of the State in which the action was originally filed or by the laws of other States;
>>
>> (C) whether the class action has been pleaded in a manner that seeks to avoid Federal jurisdiction;
>>
>> (D) whether the action was brought in a forum with a distinct nexus with the class members, the alleged harm, or the defendants;
>>
>> (E) whether the number of citizens of the State in which the action was originally filed in all proposed plaintiff classes in the aggregate is substantially larger than the number of citizens from any other State, and the citizenship of the other members of the proposed class is dispersed among a substantial number of States; and
>>
>> (F) whether, during the 3-year period preceding the filing of that class action, 1 or more other class actions asserting the same or similar claims on behalf of the same or other persons have been filed.

28 U.S.C. § 1332(d)(3).

The Court concludes that Plaintiffs have failed to meet their burden to show that more than one-third of the members of their proposed class are citizens of Ohio.  As discussed above, the Court finds that the class definition in Plaintiffs' Complaint unambiguously sets forth a nationwide class

consisting of all female Tradesmen employees, and that this is the relevant definition for purposes of determining whether CAFA jurisdiction exists. Again, Plaintiffs provide no evidence that demonstrates that one-third of the class members under this definition are citizens of Ohio. The evidence submitted by Plaintiffs only relates to the citizenship of employees that either resided in Ohio or traveled to Ohio in connection with their employment, which fails to address the citizenship of all the members of the nationwide class pled in the Complaint. In contrast, Tradesmen has provided evidence indicating that less than one-third of the putative class members nationwide are citizens of Ohio. (*See* Doc. No. 1-3 at ¶¶ 8-15.) As a result, Plaintiffs have failed to meet their burden to show that the threshold requirement for the interests of justice exception has been satisfied. As such, the Court need not analyze the factors enumerated in 28 U.S.C. § 1332(d)(3).

Because neither the local controversy nor the interests of justice exceptions to CAFA jurisdiction are applicable to Plaintiffs' class action, the Court denies Plaintiffs' Motion to Remand.[4]

### III. Tradesmen's Motion to Strike Class Claims

#### a. Legal Standard

Federal Rule of Civil Procedure 23 governs class actions brought in federal court. "To obtain class certification, a claimant must satisfy two sets of requirements: (1) each of the four prerequisites under Rule 23(a), and (2) the prerequisites of one of the three types of class actions provided for by Rule 23(b)." *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 945-46 (6th Cir. 2011). Plaintiffs seek certification under both Rule 23(b)(2) and Rule 23(b)(3). (*See* Doc. No. 1-2 at ¶¶ 19-51.)

---

[4] The Court also denies Plaintiffs' request to conduct additional discovery related to their Motion to Remand. Plaintiffs have not shown that any unproduced materials would help them establish an exception to CAFA jurisdiction. Moreover, Plaintiffs did not notify Tradesmen of the discovery issues raised in their supplemental brief in support of their Motion to Remand until two minutes before filing their brief. (Doc. No. 24-1 at ¶¶ 8-9.) As such, Plaintiffs failed to comply with Local Rule 37.1 regarding discovery disputes.

Rule 23(a) requires that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."

Rule 23(b)(2) and Rule 23(b)(3) require, respectively, that:

> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

>> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

>> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

>> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

>> (D) the likely difficulties in managing a class action.

"Rule 23 does not set forth a mere pleading standard," and "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). In addition, "certification is proper only if 'the trial court is satisfied, after a rigorous analysis,'" that all prerequisites have been satisfied. *Id.* at 350-51. Pursuant to Rule 23(c)(1)(A), courts should make such a determination "[a]t an early practicable time." "Either party may freely move for resolution of the class-certification question at any stage of the proceedings, and the class action allegations may be stricken prior to a motion for class certification

where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met." *Rikos v. Procter & Gamble Co.*, No. 1:11–cv–226, 2012 WL 641946, at *3 (S.D. Ohio Feb. 28, 2012).

### b. Analysis

Tradesmen moves to dismiss Plaintiffs' class claims pursuant to Rule 12(b)(6) or, in the alternative, to strike Plaintiffs' class allegations pursuant to Rules 12(f) and 23(d)(1)(D) because Plaintiffs' proposed nationwide class of Tradesmen employees (1) cannot be maintained because the Ohio Civil Rights Act does not apply extraterritorially, (2) applying Ohio law nationwide would violate the *Erie* doctrine, and (3) applying Ohio law nationwide would violate the Commerce Clause. (Doc. No. 8.) Plaintiffs do not dispute Tradesmen's analysis of the law, but argue that Tradesmen's Motion to Strike Class Claims should be denied because it relies on the false assumption that Plaintiffs' proposed class covers female Tradesmen employees nationwide, rather than only those employees who could have brought claims under the Ohio Civil Rights Act. (Doc. No. 14.) Alternatively, Plaintiffs request leave to amend their Complaint to clarify their class allegations. (*Id.* at 5 n.1.) The Court will strike Plaintiffs' class allegations, but permit Plaintiffs to amend their Complaint.

Plaintiffs' arguments regarding the intended scope of its proposed class are the same as those that the Court rejected above in ruling on Plaintiffs' Motion to Remand. Once again, the Court finds that Plaintiffs failed to limit the scope of the proposed class in their Complaint in the way that they claim. As noted above, Plaintiffs' class definition unambiguously applies to all female Tradesmen employees and contains no limitations regarding class members' connections to Ohio. Accordingly,

the Court must consider Tradesmen's Motion to Strike Class Claims in the context of Plaintiffs' proposed nationwide class. Such a class cannot be maintained.

Courts have stricken class allegations when a nationwide class is asserted with respect to claims under the laws of a single state that have no extraterritorial effect. *Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1059, 1063-66 (N.D. Cal. Aug. 7, 2014) (striking nationwide class claims because "plaintiffs propose to represent class members who are residents of other states, who drive for Lyft exclusively in those states, and who apparently never set foot in California" and "[t]he California wage and hour laws at issue here do not create a cause of action for people who fit this description"); *see also Rikos v. Procter & Gamble Co.*, No. 1:11–cv–226, 2012 WL 641946, at *5 n.2 (S.D. Ohio Feb. 28, 2012) (holding a nationwide class could not be certified due to constitutional limitations, but "[e]ven if Plaintiff could satisfy the Constitutional limitations on its claims, he would be unable to bring claims under [California's Unfair Competition Law] on behalf non-resident class members who purchased Align outside of California").

Here, all of Plaintiffs' claims are based on the Ohio Civil Rights Act, and Plaintiffs concede that the Ohio Civil Rights Act only covers claims that are based on conduct tied to Ohio. (Doc. No. 1-2 at ¶¶ 92-138; Doc. No. 14 at 2.) Yet, Plaintiffs' Complaint seeks to certify a nationwide class of female Tradesmen employees, which includes employees who are employed outside of Ohio, many of whom have apparently never traveled to Ohio in connection with their employment. (Doc. No. 1-2 at ¶ 19; Doc. No. 1-3 at ¶¶ 8-15.) Plaintiffs cannot impose the Ohio Civil Rights Act on Tradesmen employees with no connection to Ohio, and striking Plaintiffs' class allegations is thus appropriate.

Moreover, the application of the Ohio Civil Rights Act to a nationwide class of female Tradesmen employees would raise serious constitutional concerns. *See Cotter*, 60 F. Supp. 3d at

1063 ("The Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State.") (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982)); *Rikos*, 2012 WL 641946, at *3 ("[D]ue process concerns create constitutional limitations on a state's application of its law to the claims of nonresident class members in a nationwide class action.").

Nor, as Plaintiffs claim, is striking Plaintiffs' class claims at this juncture premature, as a district court may strike class allegations prior to discovery when no discovery or factual development "would alter the central defect in th[e] class claim." *Pilgrim*, 660 F.3d at 949.

Accordingly, the Court finds that a nationwide class may not be certified for Plaintiffs' claims and strikes Plaintiffs' class allegations.

## IV. Tradesmen's Motion to Compel Arbitration

### a. Legal Standard

The Federal Arbitration Act ("FAA") provides that an arbitration clause in "a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "This provision establishes 'a liberal federal policy favoring arbitration agreements'" and "requires courts to enforce agreements to arbitrate according to their terms." *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). The FAA also "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the

construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Mercury Constr. Corp.*, 460 U.S. at 24-25.[5]

The FAA further provides that "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. If the court finds that a party's claims are referable to arbitration, the court shall "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. However, "[i]f all the claims in the case are within the scope of the arbitration agreement and 'there is "nothing left for the district court to do but execute judgment," dismissal [of the case] is appropriate.'" *Stachurski v. DirecTV, Inc.*, 642 F. Supp. 2d 758, 764 (N.D. Ohio 2009) (quoting *Ewers v. Genuine Motor Cars, Inc.*, No. 1:07 CV 2799, 2008 WL 755268, at *7 (N.D. Ohio Mar. 19, 2008)).

"In determining whether to grant motions to dismiss or stay proceedings and compel arbitration, courts must apply a four-pronged test: (1) whether the parties agreed to arbitrate; (2) the scope of that agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be arbitrated; and (4) whether to stay the remainder of the proceedings pending arbitration." *Uszak v. AT & T, Inc.*, No. 1:14CV2800, 2015 WL 13037500, at *3 (N.D. Ohio Oct. 6, 2015).

---

[5] Ohio policy also strongly favors arbitration. *See Eagle v. Fred Martin Motor Co.*, 809 N.E.2d 1161, 1167 (Ohio Ct. App. 9th Dist. 2004) ("Ohio's public policy encourages arbitration as a method to settle disputes."); Ohio Rev. Code § 2711.01.

Thus, before granting a motion to compel arbitration, a court must first determine whether a valid agreement to arbitrate exists between the parties. If the court "is satisfied that the agreement to arbitrate is not 'in issue,' it must compel arbitration." *Great Earth Companies, Inc. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002). However, "[i]f the validity of the agreement to arbitrate is 'in issue,' the court must proceed to a trial to resolve the question." *Id.* (citing 9 U.S.C. § 4). The validity of the agreement is "in issue" when the party opposing arbitration "show[s] a genuine issue of material fact as to the validity of the agreement to arbitrate." *Id.* This showing "mirrors that required to withstand summary judgment in a civil suit." *Id.* Thus, "a court must view all facts and inferences in the light most favorable to the party opposing arbitration, and determine whether a valid agreement to arbitrate exists." *Grynko v. Sears Roebuck and Co.*, No. 1:13 CV 2482, 2014 WL 66495, at *3 (N.D. Ohio Jan. 6, 2014).

### b. Analysis

The sole issue in dispute in this case is whether the parties agreed to arbitrate. Tradesmen contends that it entered into valid agreements to arbitrate with Glass and Masiella, while Plaintiffs contend that the Arbitration Agreement lacks valid consideration and that neither Glass nor Masiella accepted the Arbitration Agreement. (Doc. No. 9-1 at 7-8; Doc. No. 15 at 5-9.) Plaintiffs also request expedited discovery and an evidentiary hearing, if necessary, to determine whether the Arbitration Agreement should be enforced. (Doc. No. 15 at 9-10.)

"Because arbitration agreements are fundamentally contracts, we review the enforceability of an arbitration agreement according to the applicable state law of contract formation." *Uszak*, 2015 WL 13037500, at *3. In Ohio, "[a] valid arbitration agreement, like any contract, requires an offer and acceptance that is supported by consideration and is premised on the parties' meeting of the minds

as to the essential terms of the agreement." *Corl v. Thomas & King*, No. 05AP-1128, 2006 WL

1629740, at *2 (Ohio Ct. App. 10th Dist. June 13, 2006); *see also Tidewater Fin. Co. v. Cowns*, 968

N.E.2d 59, 63 (Ohio Ct. App. 1st Dist. 2011) ("For a valid contract to exist, there must be an offer on

one side, an acceptance on the other side, and mutual assent between the parties with regard to the

consideration for the bargain.") (citation omitted). "Mutual assent 'ordinarily takes the form of an

*offer* or proposal by one party followed by an *acceptance* by the other party or parties.'" *Dantz v.*

*Am. Apple Group, LLC*, 123 F. App'x 702, 707 (6th Cir. 2005) (citation omitted).

### i. Consideration

Plaintiffs assert that the Arbitration Agreement is invalid because it fails to provide adequate

consideration. Plaintiffs claim adequate consideration does not exist because acceptance of the

agreement was not required for continued employment and Tradesmen's promise to arbitrate was not

mutual since the Arbitration Agreement contains a class action waiver. (Doc. No. 15 at 5-7.) In

response, Tradesmen asserts that both continued employment and Tradesmen's promise to arbitrate

constitute sufficient consideration. (Doc. No. 18 at 11-14.) The Court finds that regardless of the

validity of Glass and Masiella's continued employment as consideration, the Arbitration Agreement

is supported by adequate consideration in Tradesmen's mutual promise to arbitrate.

"Ohio law requires that consideration be present for a contract to be enforceable." *Dantz*, 123

F. App'x at 708. In general, "[c]onsideration may consist of either a detriment to the promisee or a

benefit to the promisor. A benefit may consist of some right, interest or profit accruing to the

promisor, while a detriment may consist of some forbearance, loss or responsibility given, suffered

or undertaken by the promisee." *Id.* (quoting *Harmon v. Phillip Morris, Inc.*, 697 N.E.2d 270, 272

(Ohio Ct. App. 8th Dist. 1997)). With respect to agreements to arbitrate, numerous courts have

recognized that "[w]here . . . both parties agree to take certain disputes to arbitration and to be bound by the outcome, sufficient consideration exists." *Corl*, 2006 WL 1629740, at *5; *accord Dantz*, 123 F. App'x at 708-09 (holding consideration was present when "[b]oth the employee and the employer are required to take certain defined disputes to arbitration and be bound by the outcome"); *Raasch v. NCR Corp.*, 254 F. Supp. 2d 847, 865 (S.D. Ohio 2003) ("NCR's promise to adhere to the terms of [the arbitration policy] was sufficient consideration."). "No consideration is required above and beyond the agreement to arbitrate." *Corl*, 2006 WL 1629740, at *5.

Here, sufficient consideration for the Arbitration Agreement exists. The Arbitration Agreement specifically provides that both Plaintiffs and Tradesmen "agree to binding arbitration as the exclusive means to resolve the disputes that may arise out of the Covered Claim." (Doc. No. 10-1 at 3.) Thus, in exchange for Plaintiffs' agreement to arbitrate claims against Tradesmen, Tradesmen likewise agreed to arbitrate claims against Plaintiffs. Plaintiffs assert that Tradesmen's agreement to arbitrate in and of itself cannot suffice as consideration because "the agreement is not mutual inasmuch as the arbitration program also contains a class action waiver which by its very terms cannot be mutual." (Doc. No. 15 at 6 n.1.) However, mutuality does not require "equally balanced" terms. *Raasch*, 254 F. Supp. 2d at 856. Instead, mutuality requires only that both parties "be bound to the terms of any dispute that is required to be submitted to the arbitrator." *Id.* Thus, the class action waiver is irrelevant to the determination of whether Tradesmen provided valid consideration. Accordingly, the Arbitration Agreement does not fail for lack of consideration.

### ii. Offer and Acceptance

Next, Plaintiffs argue that even if adequate consideration exists, neither Glass nor Masiella entered into the Arbitration Agreement. Plaintiffs assert that Glass was never offered and never

accepted continued employment as consideration for the Arbitration Agreement because she accepted a new job offer prior to the opt-out deadline, and that Masiella opted out of the Arbitration Agreement by returning the Opt-Out Form to Tradesmen's Human Resources Department. (Doc. No. 15 at 7-9.) In response, Tradesmen argues that Glass continued her employment with Tradesmen long enough to establish her acceptance of the Arbitration Agreement, and that Masiella failed to follow the required opt-out procedures. (Doc. No. 18 at 9-10.) The Court concludes that Glass accepted Tradesmen's offer to enter into the Arbitration Agreement, and that her claims therefore must be submitted to arbitration. However, there is a genuine issue of material fact with respect to whether Masiella opted out of the Arbitration Agreement, which requires an evidentiary hearing to resolve.

An offer may come in the form of an email informing an employee that the employer has created an arbitration program for resolving disputes. *See Uszak*, 2015 WL 13037500, at *5. In addition, in Ohio, an employee's act of continuing to work for an employer after the employer stated that doing so would constitute acceptance of an arbitration agreement is sufficient to demonstrate the employee's assent to or acceptance of its terms. For example, in *Dantz*, the defendant sent a letter to employees providing that their acceptance of an arbitration agreement would be expressed by their "continuing employment with the Company from and after October 1, 2001." 123 F. App'x at 704. On appeal, the Sixth Circuit agreed with the district court's reasoning that the "plaintiff, an at-will employee, manifested her assent in the very way that the Company requested, that is, by continuing her employment after October 1, 2001." *Id.* at 708; *see also Legair v. Circuit City Stores, Inc.*, 213 F. App'x 436, 439 (6th Cir. 2007) (finding "plaintiff by his conduct demonstrated his agreement to be bound" because he "failed to take the required action to opt out"); *Raasch*, 254 F. Supp. 2d at 867

(holding plaintiff's "act of continuing to work for NCR after it stated that doing so would constitute acceptance of the new term of employment demonstrates his assent to, or acceptance of, same").

In this case, in its very first paragraph, the Arbitration Agreement provides in bold that an employee "**consent[s] to this Agreement by continuing or accepting employment with Tradesmen International, LLC, unless you take the steps to opt out of this Agreement as described below.**" (Doc. No. 10-1 at 2.) In Paragraph C.2, the Arbitration Agreement further explains that an employee's consent to the agreement is expressed by "continuing employment with Tradesmen on and after October 21, 2016" or the "acceptance of any assignment, wages, salary, promotion, increase, transfer, bonus or other benefit of employment after on or [sic] October 21, 2016." (*Id.* at 5.)

With respect to Glass, there is no dispute that she received an email from Tradesmen on October 7, 2016 that contained the Arbitration Agreement. Indeed, Tradesmen's records show that Glass opened this email numerous times between October 7, 2016 and October 10, 2016. (Doc. No. 10 at ¶ 20.) Glass thus received a valid offer to enter into the Arbitration Agreement with Tradesmen. Moreover, Glass admits that she continued her employment with Tradesmen through the first week of November 2016 and does not claim that she ever submitted an Opt-Out Form to Tradesmen. (Doc. No. 15-1 at ¶ 7.) By failing to opt out and continuing her employment with Tradesmen past October 21, 2016, Glass manifested her assent to the Arbitration Agreement.

Plaintiffs argue that Glass located and secured another job with a different employer before October 21, 2016 and therefore did "not accept[] Tradesmen's offer of continued employment even if it was being offered." (Doc. No. 15 at 8.) The Court finds this argument unpersuasive. Glass does not contend that she terminated her employment with Tradesmen before October 21, 2016, only that

she had accepted another job. The fact that Glass eventually found another job and left her position at Tradesmen in November 2016 is immaterial to her previous acceptance, which she expressed by continuing her employment with Tradesmen after October 21, 2016. Therefore, the Court concludes that Tradesmen and Glass entered into a valid and binding agreement to arbitrate. In addition, there is no dispute that all of Glass's claims are within the scope of the Arbitration Agreement, and dismissal of her claims is thus appropriate.

With regard to Masiella, there is also no dispute that she received an email from Tradesmen on October 11, 2016 that contained the Arbitration Agreement and opened it numerous times thereafter. (Doc. No. 10 at ¶ 23.) Masiella thus received a valid offer to enter into the Arbitration Agreement with Tradesmen. Masiella also continued her employment with Tradesmen past October 21, 2016. (Doc. No. 11 at ¶ 15.)

However, Plaintiffs claim that she did not accept the Arbitration Agreement because she opted out prior to the deadline. (Doc. No. 15 at 8-9.) In support of this claim, Masiella submitted a declaration in which she states that before October 21, 2016, she executed an Opt-Out Form, brought it into Tradesmen, and hand-delivered it to Woodall. (Doc. No. 15-2 at ¶ 5.) Masiella claims that Woodall accepted the Opt-Out Form from her and at no time stated that Masiella needed to mail the form to her. (*Id.*) Masiella also asserts that she chose to opt out of the Arbitration Agreement after consulting her husband, who told her to opt out and that he had faced a similar situation at a previous employer. (*Id.* at ¶ 2.) Plaintiffs also submitted the email chain in which Masiella forwarded the Arbitration Agreement she received from Tradesmen to her husband. (Doc. No. 15-3.) In direct contrast to Masiella's declaration, Woodall has declared that Masiella did not return an Opt-Out Form

and does not appear on a spreadsheet that tracked which employees had submitted an Opt-Out Form. (Doc. No. 11 at ¶¶ 12-13.)

Tradesmen asserts that even if Masiella did deliver the Opt-Out Form to Woodall, Masiella failed to opt out of the Arbitration Agreement because both the Arbitration Agreement and the Opt-Out Form specified that the Opt-Out Form had to be sent by certified mail or overnight delivery to Tradesmen's Human Resources Department. (Doc. No. 10-1 at 5; Doc. No. 18-1 at Ex. 7.) Thus, Tradesmen contends Masiella cannot demonstrate that she opted out in accordance with the terms of the Arbitration Agreement and she is therefore bound by it. (Doc. No. 18 at 9.) The Court disagrees.

In Ohio, "[t]he long and uniformly settled rule as to contracts requires only a substantial performance in order to recover upon such contract. Merely nominal, trifling, or technical departures are not sufficient to breach the contract." *Atsco Holdings Corp. v. Air Tool Serv. Co.*, No. 1:15CV1586, 2017 U.S. Dist. LEXIS 224626, at *11-12 (N.D. Ohio Dec. 20, 2017) (quoting *Stonehenge Land Co. v. Beazer Homes Invests., L.L.C.*, 893 N.E.2d 855, 863 (Ohio Ct. App. 10th Dist. 2008)). "A court should confine the application of the doctrine of substantial performance to cases where the party has made a [sic] honest or good faith effort to perform the terms of the contract." *Burlington Resources Oil & Gas Co. v. Cox*, 729 N.E.2d 398, 402 (Ohio Ct. App. 4th Dist. 1999). In addition, "[f]or the doctrine of substantial performance to apply, the part unperformed must not destroy the value or purpose of the contract." *Hansel v. Creative Concrete & Masonry Constr. Co.*, 772 N.E.2d 138, 141 (Ohio Ct. App. 10th Dist. 2002).

Applying this doctrine, multiple courts have found that a party substantially complied with notice provisions in a contract despite not adhering to the exact requirements as to the method of notice. *See Atsco Holdings*, 2017 U.S. Dist. LEXIS 224626, at *11 (finding notice of a claim by

email was "sufficient under the law" even though the contract required that notice be "hand delivered or sent by certified or registered mail, return receipt requested and postage prepaid, overnight mail or courier, or telecopier"); *Stonehenge Land*, 893 N.E.2d at 863-64 ("Stonehenge's attorney's letter to Beazer's attorney may have deviated from the contract's express terms as to where Stonehenge was required to send written notice of default and election to pursue contractual remedies for breach. However, under the facts and circumstances of this case, we cannot say that this technical deviation was sufficient to constitute breach of the 2004 contract that would relieve Beazer of liability for its breach.").

Likewise, here, Masiella claims that she hand-delivered her executed Opt-Out Form to Woodall—Tradesmen's Human Resources Director—who did not inform her that she could not accept the Opt-Out Form or that it had to be mailed. While not strictly compliant with the requirement that the Opt-Out Form be mailed to Tradesmen's Human Resources Department by certified or overnight mail, Masiella's conduct, if taken as true, substantially complied with the opt-out provision of the Arbitration Agreement. However, Woodall has stated in her declaration that Masiella never returned an Opt-Out Form to Tradesmen. (Doc. No. 11 at ¶ 12.) Based on this conflicting evidence, the Court finds a genuine issue of material fact exists with respect to whether Masiella opted out of the Arbitration Agreement. As such, the validity of the Arbitration Agreement is in issue, and an evidentiary hearing is required.

V.   **Conclusion**

For the reasons set forth above:

McClone's Motion to Join (Doc. No. 12) is GRANTED.

Plaintiffs' Motion to Remand (Doc. No. 13) is DENIED.

Tradesmen's Motion to Strike Class Claims (Doc. No. 8) is GRANTED. The class allegations in Plaintiffs' Complaint are stricken. Plaintiffs are granted leave to amend their Complaint within 30 days of this order.

Tradesmen's Motion to Compel Arbitration (Doc. No. 9) is GRANTED IN PART, as follows. Glass's claims are dismissed, and Glass and Defendants are ordered to arbitration pursuant to the terms of the Arbitration Agreement. The Court will defer ruling on Tradesmen's Motion to Compel Arbitration with respect Masiella until the completion of an evidentiary hearing to determine whether there exists an enforceable arbitration agreement between Masiella and Tradesmen. Accordingly, an evidentiary hearing is set on April 14, 2020 at 1:30 p.m. The parties may conduct discovery prior to the hearing on issues relevant to the existence of an enforceable arbitration agreement between Masiella and Tradesmen. All written discovery requests must be issued within seven (7) days from the date of this order, and responses are due within fourteen (14) days after service of the request. All depositions must be completed prior to the evidentiary hearing.

**IT IS SO ORDERED.**


   *s/Pamela A. Barker*
   PAMELA A. BARKER
Date: February 19, 2020    U. S. DISTRICT JUDGE