# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **JENNIFER GLASS, et al.,** | CASE NO. 5:19-CV-01331 |
| **Plaintiffs,** | |
| -vs- | JUDGE PAMELA A. BARKER |
| **TRADESMEN INTERNATIONAL, LLC, et al.,** | MEMORANDUM OF OPINION AND ORDER |
| **Defendants.** | |

This matter comes before the Court upon the Motion to Compel Individual Arbitration and Dismiss the Claims of Plaintiffs Masiella and Glass ("Motion to Compel Arbitration") of Defendant Tradesmen International, LLC ("Tradesmen"), in which Defendant Matthew McClone ("McClone") has joined.  (Doc. Nos. 9, 12.)  On February 19, 2020, the Court granted Tradesmen's Motion to Compel Arbitration in part, dismissing Plaintiff Jennifer Glass's ("Glass") claims and ordering Tradesmen, McClone, and Glass to arbitration.  (Doc. No. 25 at 29.)  However, the Court determined that genuine issues of material fact existed regarding whether Plaintiff Kristie Masiella ("Masiella") and Tradesmen entered into an agreement to arbitrate.  (*Id.* at 26-28.)  As a result, the Court deferred ruling on Tradesmen's Motion to Compel Arbitration with respect to Masiella until the completion of an evidentiary hearing.  (*Id.* at 29.)  The Court held that evidentiary hearing on September 25, 2020. (Doc. No. 42.)

For the following reasons, Tradesmen's Motion to Compel Arbitration (Doc. No. 9) is GRANTED with respect to Masiella's claims.

## I. Background

On May 10, 2019, Glass, Masiella, and Tracy Reese (collectively, "Plaintiffs") filed a Class Action Complaint ("Complaint") against Tradesmen and McClone (collectively, "Defendants") in the Court of Common Pleas of Summit County, Ohio. (Doc. No. 1-2.) In the Complaint, Plaintiffs asserted claims on behalf of themselves and a putative class of female employees against Defendants for gender discrimination, sexual harassment/hostile work environment, retaliation, and aiding and abetting discrimination in violation of the Ohio Civil Rights Act, Ohio Rev. Code § 4112. (*Id.*)[1] On June 10, 2019, Tradesmen removed the suit to this Court. (Doc. No. 1.)[2]

Shortly thereafter, on June 17, 2019, Tradesmen filed its Motion to Compel Arbitration, requesting an order compelling individual arbitration and dismissing the claims of Masiella and Glass. (Doc. No. 9.) In support of its Motion, Tradesmen submitted evidence that in October 2016, while Masiella and Glass were still employed at Tradesmen, Tradesmen sent an email containing an Employment Arbitration Agreement ("Arbitration Agreement") to its employees, which both Masiella and Glass opened. (Doc. No. 10 at ¶¶ 5-23.) The Arbitration Agreement provided that, unless they opted out, employees would consent to the Arbitration Agreement by continuing their employment with Tradesmen after October 21, 2016. (Doc. No. 10-1 at 5.) To opt out, the Arbitration Agreement required employees to notify Tradesmen that they were opting out by October 21, 2016 by sending a completed Opt-Out Form "by certified mail or overnight delivery to Tradesmen International, LLC, Human Resources Department ('Tradesmen HR'): Attention Arbitration, 9760 Shepard Road, Macedonia, Ohio 44056." (*Id.*) Jeannie Woodall ("Woodall"), Tradesmen's Director

---

[1] Plaintiffs, excluding Glass, have since amended their Complaint twice after the Court ordered Glass to arbitration and struck Plaintiffs' class allegations. (*See* Doc. Nos. 25, 27, 29.)
[2] The Court denied Plaintiffs' Motion to Remand on February 19, 2020. (Doc. No. 25.)

2

of Human Resources in October 2016, also submitted a declaration on behalf of Tradesmen stating that neither Masiella nor Glass returned an Opt-Out Form. (Doc. No. 11 at ¶¶ 2, 12.) Accordingly, Tradesmen argued that because neither Masiella nor Glass opted out by the deadline and because they both continued their employment with Tradesmen after October 21, 2016, they both entered into a valid agreement to arbitrate their claims against Tradesmen. (*See* Doc. No. 9.)

In opposition to Tradesmen's Motion to Compel Arbitration, Masiella and Glass did not dispute that they received and opened emails containing the Arbitration Agreement. Nor did they dispute that the Arbitration Agreement, if valid, would cover the claims alleged against Tradesmen in this action. However, they argued that the Arbitration Agreement was invalid because it did not provide adequate consideration. (Doc. No. 15 at 5-7.) Glass also argued that she was never offered and never accepted continued employment as consideration for the Arbitration Agreement because she accepted a new job offer prior to the opt-out deadline, although she admitted she continued her employment with Tradesmen through the first week of November 2016. (*Id.* at 7-8; Doc. No. 15-1 at ¶ 7.) In addition, Masiella asserted that she opted out of the Arbitration Agreement by returning an Opt-Out Form to Tradesmen's Human Resources Department. (Doc. No. 15 at 8-9.) In support of her contention, Masiella submitted a declaration in which she stated that before October 21, 2016, she executed an Opt-Out Form, brought it into Tradesmen, and hand-delivered it to Woodall. (Doc. No. 15-2 at ¶ 5.) Masiella further claimed that Woodall accepted the Opt-Out Form and at no time stated that Masiella needed to mail the form to her. (*Id.*) Masiella also asserted that she chose to opt out of the Arbitration Agreement after consulting her husband, who told her to opt out and that he had faced a similar situation at a previous employer. (*Id.* at ¶ 2; Doc. No. 15-3.)

3

On reply, Tradesmen argued that valid consideration was present and responded to Glass's arguments regarding her lack of acceptance. (Doc. No. 18 at 10-14.) Tradesmen also asserted that even if Masiella did return an Opt-Out Form directly to Woodall, that was insufficient to opt out because the Arbitration Agreement specifically required her to mail the Opt-Out Form to Tradesmen's Human Resources Department, not hand-deliver it. (*Id.* at 9.)

On February 19, 2020, the Court granted Tradesmen's Motion to Compel Arbitration in part. The Court found that the Arbitration Agreement was supported by valid consideration, as the promise to arbitrate was mutual. (Doc. No. 25 at 22-23.) Moreover, because it was undisputed that Glass did not opt out and continued her employment with Tradesmen past October 21, 2016, there was no genuine issue of material fact with respect to whether Glass had entered into the Arbitration Agreement. (*Id.* at 23-26.) Accordingly, the Court dismissed Glass's claims and ordered Defendants and Glass to arbitration pursuant to the terms of the Arbitration Agreement. (*Id.* at 29.) However, the Court determined that genuine issues of material fact existed regarding whether Masiella and Tradesmen entered into an agreement to arbitrate. (*Id.* at 26-28.) Specifically, the Court held that while not strictly compliant with the requirement that the Opt-Out Form be mailed to Tradesmen's Human Resources Department by certified or overnight mail, Masiella's conduct, if true, substantially complied with the opt-out provision of the Arbitration Agreement, which would mean that she never accepted the agreement. (*Id.* at 28.) Given the conflicting statements in Masiella's and Woodall's declarations regarding whether Masiella returned an Opt-Out Form, the Court concluded an evidentiary hearing was necessary. (*Id.* at 28-29.) As a result, the Court deferred ruling on Tradesmen's Motion to Compel Arbitration with respect to Masiella until the completion of an evidentiary hearing. (*Id.* at 29.) Prior to the hearing, the Court also permitted the parties to engage

4

in discovery on the limited remaining issues relevant to the existence of an enforceable arbitration agreement. (*Id.*)

The Court held an evidentiary hearing on September 25, 2020. (Doc. No. 42.)[3] During the hearing, Masiella and her husband, Paul Masiella, testified on her behalf. Consistent with her previous declaration, Masiella testified that she received an email from Tradesmen containing the Arbitration Agreement in October 2016 and subsequently forwarded the email to her husband asking for his advice. Evidence of that email exchange, originally submitted in conjunction with Masiella's opposition to Tradesmen's Motion to Compel Arbitration, shows that on October 12, 2016, Masiella forwarded the email containing the Arbitration Agreement to her husband, asking, "Should I sign this?" (Doc. No. 15-3 at 1.) At the hearing, Masiella explained that in her email, she was asking whether she should sign the Opt-Out Form. As noted in testimony later in the hearing, the only thing that could be signed was the Opt-Out Form, as there was no place for a signature on the Arbitration Agreement. Shortly after Masiella forwarded the email, her husband responded, "Yeah, go ahead and sign. GE did the same thing the last year I was there." (*Id.*) According to Masiella, that evening, she further discussed the Opt-Out Form with her husband, and he told her to sign it and deliver it to Tradesmen's Human Resources Department the next day. Masiella testified that she signed and dated the form, and her husband folded the form in half, put it in her purse, and told her to make sure to give it to the Human Resources Department the following day.

Masiella testified that the next day, October 13, 2016, she was sitting at her desk in her cubicle when she saw Woodall coming. Masiella further testified that she stood up, let Woodall know that

---

[3] The Court originally set the evidentiary hearing for April 14, 2020, but was forced to reschedule the hearing once due to a conflict with Defendants' schedule and once due to restrictions related to COVID-19. (*See* Doc. No. 25 at 29; Doc. No. 26.)

5

she had something to give her, pulled the folded Opt-Out Form from her purse, and handed it to Woodall, who said thanks and walked away. Masiella also testified that it was common for her to see Woodall by her part of the office because Masiella's cubicle was close to a restroom, the legal department, and a conference room that Woodall used and sometimes cut through. According to Masiella, that evening, her husband asked her whether she had turned in the Opt-Out Form, and she replied that she had given it to Woodall. On cross-examination, Masiella admitted that she did not make or retain a copy of her signed Opt-Out Form, take a picture of it with her cell phone, or send it via intra-office memorandum, although it would have taken little time to do so.

As noted above, Masiella's husband also testified at the evidentiary hearing. His testimony was consistent with Masiella's testimony regarding their initial email exchange, their discussion the evening of October 12, 2016 when he advised her to sign the Opt-Out Form and placed it in her purse to take to the Human Resources Department, and their conversation the next day when Masiella informed him that she had handed the form to Woodall. He also provided more detail regarding his experience at GE when it rolled out an arbitration program in a similar manner and explained that he told Masiella to opt out because he believed the Arbitration Agreement took away her rights to a jury trial and to pursue a class action. On cross-examination, Masiella's husband also admitted that he did not make or retain a copy of Masiella's signed Opt-Out Form or take a picture of it with his cell phone, although it would have taken little time to do so. He also admitted that he had a firebox in which he kept important documents, including the arbitration agreement from GE and his opt-out form, but that he did not place a copy of Masiella's Opt-Out Form there. He explained the reason for this was that he used to rely more heavily on paper, but that he kept Masiella's Arbitration Agreement in his Gmail account.

6

After Masiella and her husband testified, Tradesmen presented Woodall as its only witness. Woodall testified that in October 2016, she worked as Tradesmen's Director of Human Resources. In her role, Woodall was involved in the creation of the Arbitration Agreement, its distribution to Tradesmen's employees, and the collection of Opt-Out Forms. She further testified that there were two ways in which Tradesmen kept track of Opt-Out Forms that it received. First, Woodall stated that an employee under her oversight in the Human Resources Department created a tracking spreadsheet on which they would enter the information for any Opt-Out Forms they received. This spreadsheet was presented and admitted into evidence at the hearing. According to Woodall, it was her practice to enter the information for any employee that opted out on the spreadsheet immediately upon receiving an Opt-Out Form. She also testified that she and her coworker would accept Opt-Out Forms and record them on the spreadsheet regardless of how the Opt-Out Form was delivered to them. For example, Woodall stated that four employees, not including Masiella, hand-delivered their Opt-Out Forms to her. Woodall testified that each of these employees handed their respective Opt-Out Forms to Woodall in her office, and Woodall recalled each of them delivering the form. These employees' names are on the tracking spreadsheet. However, Masiella's name is not on the spreadsheet.

With respect to the second way in which Woodall and her coworker kept track of the Opt-Out Forms they received, Woodall testified that after logging the information on the tracking spreadsheet, they would retain the Opt-Out Form for each employee. For corporate and office employees, they maintained the completed Opt-Out Forms in the employees' personnel files. For field employees, they kept the Opt-Out Forms in a folder in a locked desk in the Human Resources Department. Woodall further testified that she looked in Masiella's personnel file and the folder for field

7

employees, but did not find an Opt-Out Form for Masiella. Woodall did have copies of the Opt-Out Forms for the four employees that hand-delivered their forms to Woodall in her office.

In direct contrast with Masiella's testimony, Woodall also testified that Masiella never hand-delivered an Opt-Out Form to her. When asked how she knew this, Woodall first noted the fact that Masiella is not on the tracking spreadsheet and there is no physical Opt-Out Form for her in Woodall's records, which means Masiella never returned an Opt-Out Form.

Woodall also stated that she did not walk by Masiella's cubicle on October 13, 2016 because it was not in her normal foot-pattern. Woodall testified that she and Masiella sat in different wings, that she would sometimes go a couple of weeks without seeing Masiella, and that there are only two reasons she could think of that she would have walked by Masiella's cubicle. First, Woodall indicated that she might walk by Masiella if Woodall was giving a tour of the office to new hires, but Woodall stated that she looked at her calendar and that no tours took place on October 13, 2016. Second, Woodall stated she might walk there if mail was misdelivered to her office that should have gone to Masiella, but that this was rare. Woodall also testified, using a floor plan of the office to demonstrate, that she would not have needed to walk past Masiella's cubicle to get to the restrooms, any conference rooms, or the legal department, including more specifically any of the offices of other employees that she interacted with in the legal department. Based on the office floor plan, it is clear that the natural route from Woodall's office to any of these destinations would not have taken her down the hallway next to Masiella's cubicle. On cross-examination, Woodall did admit, however, that if Masiella leaned out of her cubicle to look down the hallway or physically got out of her cubicle to look, she could have seen Woodall walking by a corner in between the legal department and the restrooms.

Finally, Woodall explained that it is her personal practice not to accept forms from employees unless they come into her office because she does not want to risk another employee seeing their private information as she walked around the building.  As such, it would have been out of the ordinary for someone to hand her a form outside her office because she would not accept it.  With respect to Masiella specifically, Woodall stated that she never received paperwork from Masiella outside her office, but that Masiella had previously gone to Woodall's office to drop off paperwork.

At the conclusion of the hearing, the Court took the matter under advisement and informed the parties that a decision would be forthcoming.

## II.  Legal Standard

The Federal Arbitration Act ("FAA") provides that an arbitration clause in "a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "This provision establishes 'a liberal federal policy favoring arbitration agreements'" and "requires courts to enforce agreements to arbitrate according to their terms."  *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).  The FAA also "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."  *Mercury Constr. Corp.*, 460 U.S. at 24-25.

The FAA further provides that "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in

9

admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. If the court finds that a party's claims are referable to arbitration, the court shall "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. However, "[i]f all the claims in the case are within the scope of the arbitration agreement and 'there is "nothing left for the district court to do but execute judgment," dismissal [of the case] is appropriate.'" *Stachurski v. DirecTV, Inc.*, 642 F. Supp. 2d 758, 764 (N.D. Ohio 2009) (quoting *Ewers v. Genuine Motor Cars, Inc.*, No. 1:07 CV 2799, 2008 WL 755268, at *7 (N.D. Ohio Mar. 19, 2008)).

"In determining whether to grant motions to dismiss or stay proceedings and compel arbitration, courts must apply a four-pronged test: (1) whether the parties agreed to arbitrate; (2) the scope of that agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be arbitrated; and (4) whether to stay the remainder of the proceedings pending arbitration." *Uszak v. AT & T, Inc.*, No. 1:14CV2800, 2015 WL 13037500, at *3 (N.D. Ohio Oct. 6, 2015).

**III. Analysis**

As noted above, the sole remaining issue with respect to Tradesmen's Motion to Compel Arbitration is whether the parties agreed to arbitrate, and, more specifically, whether Masiella opted out of the Arbitration Agreement by returning an Opt-Out Form to Woodall or failed to opt out and therefore accepted the Arbitration Agreement. Having considered the testimony and evidence given at the evidentiary hearing, as well as the parties' earlier briefing on the issue, the Court finds that Tradesmen has met its burden to show that it entered into an agreement to arbitrate with Masiella.

"Before compelling an unwilling party to arbitrate, the court must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Hergenreder v. Bickford Senior Living Grp., LLC*, 656 F.3d 411, 416 (6th Cir. 2011) (quoting *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003)). "Because arbitration agreements are fundamentally contracts, we review the enforceability of an arbitration agreement according to the applicable state law of contract formation." *Id.* (quoting *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007)). Under Ohio law, "[f]or a valid contract to exist, there must be an offer on one side, an acceptance on the other side, and mutual assent between the parties with regard to the consideration for the bargain." *Uszak*, 2015 WL 13037500, at *3 (quoting *Tidewater Fin. Co. v. Cowns*, 968 N.E.2d 59, 63 (Ohio Ct. App. 1st Dist. 2011)). In addition, "[t]he party asserting the existence of a contract bears the burden of demonstrating its existence by a preponderance of the evidence." *Id.*

In this case, Masiella testified that the day after consulting with her husband about whether to opt out of the Arbitration Agreement, she hand-delivered her completed Opt-Out Form to Woodall when Woodall walked by her cubicle. While it is undisputed that Masiella did email and consult her husband regarding whether to opt out, Masiella's testimony regarding her actual delivery of the Opt-Out Form to Woodall is questionable for several reasons. First, it is undisputed that Masiella's name is not on the spreadsheet used to track employees that have opted out and that Woodall could not find a copy of Masiella's Opt-Out Form in Masiella's personnel file or other records despite Woodall's practice of maintaining physical copies of all Opt-Out Forms received. Thus, to accept Masiella's testimony regarding her handing in of the Opt-Out Form, the Court would have to assume that

11

Woodall somehow lost Masiella's Opt-Out Form on the way back to her office and that Woodall did not follow her regular practice of both immediately recording any opt-out information on the tracking spreadsheet and placing a copy of the employee's Opt-Out Form in his or her personnel file. There is no evidence that Woodall lost any other Opt-Out Forms or deviated from these procedures for other employees, including other employees that hand-delivered their Opt-Out Forms.

Second, Masiella testified that she handed her Opt-Out Form to Woodall when Woodall happened to walk by her cubicle, which Masiella stated was a common occurrence because of her cubicle's proximity to the restrooms, the legal department, and a conference room utilized by Woodall. However, the floor plan of the office contradicts Masiella's testimony in this regard and shows that Woodall would not have needed to walk by Masiella's cubicle to get to the restrooms, the legal department, or any conference rooms. Instead, the floor plan tends to support Woodall's testimony that she rarely ever walked by Masiella's cubicle, could go weeks without seeing Masiella, and did not walk by Masiella's cubicle that day.

Third, Woodall testified that it is her personal practice not to accept forms from employees unless they come into her office because she does not want to risk another employee seeing their private information as she walked around the building. As such, Woodall testified that it would have been out of the ordinary for someone to hand her a form outside her office because she would not accept it. Despite this practice, Masiella claims that she handed her Opt-Out Form to Woodall without any explanation as to what it was, and that Woodall accepted it without question and walked away. The Court finds such an interaction to be unlikely in light of Woodall's general custom not to accept paperwork outside her office. Moreover, regardless of Woodall's personal practice, the Court would find it odd for any human resources officer to accept paperwork from an employee without any

additional conversation regarding the contents of the paperwork or the reason it was being provided. Yet, the only details Masiella provided regarding her interaction with Woodall is that she told Woodall she had something for her, that she handed Woodall the document, and that Woodall said thanks and walked away.

Finally, neither Masiella nor her husband retained a copy of the executed Opt-Out Form or any other proof of completion or delivery despite the fact that they easily could have done so. In fact, Masiella's husband testified that he kept a copy of his opt-out form from his former employer because of its importance when he opted out of a similar arbitration program. And while he testified that he had shifted to keeping more electronic records by October 2016 and kept a copy of Masiella's Arbitration Agreement in his Gmail account, he still made no copy, electronic or otherwise, of Masiella's executed Opt-Out Form.

For all of these reasons, the Court finds Woodall's testimony that she never received an Opt-Out Form from Masiella more credible than Masiella's version of events. As noted throughout the Court's discussion above, Woodall's testimony is better supported by the evidence, including the absence of Masiella's name from the tracking spreadsheet, the absence of a copy of her executed Opt-Out Form in Tradesmen's records, and the floor plan of Tradesmen's office. Therefore, the Court concludes that Tradesmen has met its burden to show that Masiella never opted out of the Arbitration Agreement, that Masiella accepted Tradesmen's offer by continuing her employment with Tradesmen past the opt-out deadline, and that Tradesmen and Masiella entered into a valid and binding agreement to arbitrate. In addition, because there is no dispute that all of Masiella's claims are within the scope of the Arbitration Agreement, dismissal of her claims is appropriate. *See Stachurski*, 642 F. Supp. 2d at 764.

## IV. Conclusion

For the reasons set forth above, Tradesmen's Motion to Compel Arbitration (Doc. No. 9) is GRANTED with respect to Masiella's claims. Masiella's claims are dismissed, and Masiella and Defendants are ordered to arbitration pursuant to the terms of the Arbitration Agreement.

**IT IS SO ORDERED.**

Date: September 29, 2020

                                  *s/Pamela A. Barker*
                                  PAMELA A. BARKER
                                  U. S. DISTRICT JUDGE